**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION**

**JACKIE COLON HEAVENER and
BETTY HEAVENER,**

    **Plaintiffs,**

v.                                                                                  Case No. 1:04cv24/SPM/AK

**THE UNITED STATES OF AMERICA,**

    **Defendant.**
_____/

**MEMORANDUM OF DECISION**

This matter was tried before the Court on June 13 -16, 2005.  Upon consideration of the evidence and arguments presented, this Court makes the following findings of fact and conclusions of law.

**A.     FINDINGS OF FACT - LIABILITY**

1. Plaintiff, Jackie Heavener, a 70 year old male, was admitted to the Gainesville VA Medical Center through the emergency room on June 1, 2002.  JE-1, page HJ-00076.[1] He was found to have obstruction of his bile duct due to gallstones, which was treated through surgical removal of his gallbladder on June 4, 2002.  J-E 1, page HJ-00084.

2. Prior to the gall bladder surgery, Dr. D. Scott Lind explained to Mr. Heavener the procedure's risks, which included the possibility of a bile duct leak.  J-E 1, page HJ-00106.

---

[1] "JE-1" denotes that the information is derived from Joint Exhibit 1.

3.  Drs. Lind and Shay Dean performed the procedure. JE-1, page HJ-00084. Because of the degree of inflammation encountered in the area of the gallbladder, the attempted laparoscopic procedure was converted to open. JE-1, page HJ-00084. Even with an open procedure, the actual stump of the cystic duct$^2$ could not be identified and tied off. J-E 1, page HJ-00084. Therefore, the VA surgical team placed a Jackson Pratt (JP) drain in Mr. Heavener's abdomen. J-E 1, page HJ-00084. As Dr. Coletta testified, the purpose of the JP drain was to drain away any bile (a digestive fluid created by the liver and stored in the gallbladder) which escaped from the cystic duct stump into the peritoneal spaces (free space in the abdominal cavity). While Mr. Heavener recovered in the hospital, a mild amount of bile drained into the JP drain.$^3$ JE-1, page HJ-00084. Mr. Heavener was discharged from the VA hospital on June 8, 2002. JE-1, page HJ-00084. Upon discharge, Mr. and Mrs. Heavener were given instructions to keep a log of the drainage and bring it with them to the follow-up examination scheduled for June 12, 2002. JE-1, page HJ-00084.

4.  On June 12, 2002, Mr. Heavener returned to the VA Surgery Clinic and was seen by Theophilus John-Finn, a physician's assistant. JE-2D, page HJ-02776. Mr. Heavener was feeling well and had no fever. JE-2D, page HJ-02776. The JP drain was in place

---

$^2$Dr. Anthony Coletta, Plaintiff's expert, testified that the cystic duct connects the gallbladder to the common bile duct.

$^3$Despite Dr. Dominique Coco's June 6 note that "little to no bile [was] appreciated," and his June 7 note that "no bile [was] appreciated," Dr. Dean's discharge report on June 8 indicates that Mr. Heavener "had drainage of a mild amount of bile daily from his drain." JE1, pages HJ-00111, HJ-00112, HJ-00084. Furthermore, Dr. Lind testified that there "may have been a small amount" of bile in the serosanguinous fluid.

and contained 10 milliliters of clear fluid.[4]  JE-2D, page HJ-02776.  Mr. John-Finn examined Mr. Heavener and inquired as to the length of time over which the 10 milliliters of fluid had accumulated.[5]  Mr. John-Finn then consulted with Dr. Tina Lam, an attending surgeon and Mr. John-Finn's supervising physician, before removing the JP drain.[6]

5.      Immediately upon removal of the JP drain, Mr. Heavener doubled over in pain. JE-2D, page HJ-02776.  Motrin was administered to relieve the pain; however, Mr. Heavener's pain did not subside.  JE-2D, page HJ-02776.  Morphine was then administered, and the pain still did not subside.  JE-2D, page HJ-02776.  At trial, it was undisputed that it is extremely unusual for a patient to experience, following removal of a JP drain, pain of the intensity and duration as was experienced by Mr. Heavener.  Therefore, Dr. Lam admitted Mr. Heavener to the VA Hospital for observation.  JE-2D, page HJ-02776.

6.      Undisputed testimony revealed that from the time he was admitted on June 12, 2002,

---

[4]Mr. John-Finn's note does not describe the 10 milliliters of fluid inside the bulb of the drain.  Both Mr. and Mrs. Heavener testified that prior to the June 12 follow-up visit, when Mrs. Heavener would empty the drain, the fluid was green and foul-smelling.  Mr. John-Finn testified that on June 12, when he removed the drain, the fluid was clear.  This Court finds that Mr. John-Finn, an experienced physician's assistant, would not have pulled the drain had the fluid been green and foul-smelling.

[5]Mr. John-Finn testified that his standard procedure would be to inquire as to the length of time over which the fluid in the JP drain had accumulated.

[6]Mr. and Mrs. Heavener testified that Mr. John-Finn neither left the room, picked up the phone, nor typed anything on a computer prior to pulling the JP drain.  However, Mr. John-Finn testified that he physically left the room and consulted Dr. Lam prior to pulling the drain.  Mr. John-Finn further testified that consultation with an attending physician before pulling a JP drain is a part of his standard procedure.  Moreover, although Dr. Lam had no independent recollection of the event, she testified that Mr. John-Finn would not have pulled the drain without first consulting with her.

3

through June16, 2002, Mr. Heavener's care was provided by a team of physicians which primarily consisted of an attending surgeon, Dr. Lind; one third year surgical resident, Dr. Dean; and one first year surgical resident (or intern), Dr. Dominique Coco (collectively, "the team"). Dr. Coco saw each patient at least three times a day. The intern and residents performed rounds in the morning and usually the entire team rounded with the attending surgeons in the afternoons or evenings. The team discussed each patient's care and formulated a plan of treatment. The treatment decisions were made based upon many factors, including information received from the nursing staff, lab results, physical exams, and vital signs.

7. On June 12, 2002, Dr. Coco examined Mr. Heavener and found that there was mild tenderness in the lower right quadrant of his abdomen but no distention. JE-2A, page HJ-00197. His white blood cell (WBC) count was above average. At trial, Drs. Coletta, Weber, and Lind agreed that an elevated WBC count is indicative of some insidious internal process. JE-2A, page HJ-00646. The rest of Mr. Heavener's vital signs were within an acceptable range. JE-2A, page HJ-00197. However, he experienced a "coffee ground emetic episode," which Dr. Coco testified means he vomited a dark brown substance. JE-2A, page HJ-00197. Dr. Coco further testified that the color of Mr. Heavener's vomit could be explained by a process that occurs when blood interacts with an acidic substance.

8. Dr. Coco testified that on June 12, 2002, bile leak was included in the team's differential diagnosis. Moreover, Drs. Lind and Colletta testified that a bile leak should be diagnosed and treated as soon as possible in order to avoid the onset of bile peritonitis.

9.  Undisputed testimony revealed that no test was administered on June 12, 2002, to rule out the possibility that Mr. Heavener was suffering from a bile leak.

10. On the morning of June 13, 2002, Mr. Heavener reported feeling well and without pain, although morphine continued to be administered, at least through the early morning hours.  JE-2A, page HJ-00282; JE-2D, page HJ-02780.  Mr. Heavener's WBC count had declined since the 12th, but it remained above average and his abdomen had become slightly distended.  JE-2A, page HJ-00282.  Nevertheless, the team determined that Mr. Heavener's condition was improving and considered discharging him that evening or the next day.  JE-2A, page HJ-00282.

11. Undisputed testimony revealed that no test was administered on June 13, 2002 to rule out the possibility that Mr. Heavener was suffering from a bile leak.

12. On June 14, 2002, Mr. Heavener's condition deteriorated.  He developed a fever overnight and had two episodes of vomiting.  JE-2A, page HJ-00285; JE-2D, page HJ-2785.  In addition, his abdomen had become hard[7] and distended, and the pain had worsened.  JE-2A, page HJ-00285.  His WBC count remained high.  JE-2A, HJ-00285.  He began to improve in the evening; however, this improvement can be explained by the administration of Tylenol to relieve the fever and 8 milligrams of morphine.  JE-2A, page HJ-00287; JE-2D, page HJ-02785.

13. Also on June 14, 2002, at Dr. Coco's request, Dr. Melissa Glantz performed a CT Scan

---

[7] The nurse's notes on June 14 described the abdomen as "hard," while the doctor's notes described it as "soft."  Cynthia Robertson, the author of the nurse's note, is an LPN with over 20 years of experience.  Dr. Coco, the author of the doctor's note, was a first-year resident at the time.  Dr. Coletta attributed the difference in the examinations to the subjective nature of abdominal exams.

with contrast on Mr. Heavener's abdomen. JE-2B, page HJ-00921. The CT Scan revealed that there was moderate "ascietes," or fluid, surrounding Mr. Heavener's spleen, liver, and small bowel. JE-2B, HJ-00920-21. An addendum to the report indicates that Dr. Glantz relayed her findings to Dr. Coco and suggested that Mr. Heavener might have been suffering from a bile leak. JE-2B, HJ-00921. Dr. Glantz further suggested that a test be administered to determine whether a bile leak was in fact the cause of Mr. Heavener's problems. JE-2B, HJ-00921.

14. Undisputed testimony revealed that no test was administered on June 14, 2002, to rule out the possibility that Mr. Heavener was suffering from a bile leak.

15. On June 15, 2002, Mr. Heavener reported feeling better, and that his pain had subsided, but he had also administered 42.8 milligrams of morphine to himself in an 8-hour period. JE-2D, HJ-02797. According to the nurse's note, Mr. Heavener's abdomen remained round and hard,[8] and there was some tenderness. JE-2A, page HJ-00288; JE-2D, page HJ-02797. The team did not order any labs to determine whether Mr. Heavener's WBC count had declined. JE-2A, page HJ-00288. Based on Mr. Heavener's condition, the team decided to discontinue the self-administered morphine and order an enema for Mr. Heavener. JE-2A, page HJ-00288.

16. Undisputed testimony revealed that no test was administered on June 15, 2002, to rule out the possibility that Mr. Heavener was suffering from a bile leak.

17. On June 16, 2002, Mr. Heavener's condition had further deteriorated. His abdomen remained distended, and he experienced rebound tenderness, which Dr. Coco testified is

---

[8]Like his June 14th examination, Dr. Coco found the abdomen to be distended but soft.

6

a sign of severe infection of the peritoneal cavity. JE-2A, page HJ-00290. He had developed a fever, and his WBC count had risen to its highest level. JE-2A, page HJ-00290.

18. Michael Heavener, the Heaveners' adult son, testified that he arrived at the VA Hospital in the morning of June 16, 2002. He found Mr. Heavener lying on his back and described his belly as "blown up and tight." Mr. Heavener was conscious but not coherent. Michael Heavener became concerned with his father's condition and asked Dr. Coco about the cause of his condition. Dr. Coco informed Michael Heavener that there had been a complication with the previous surgery and that the team was observing Mr. Heavener. Michael Heavener was unsatisfied with this response and persistently demanded something more be done.

19. By mid-day on June 16, 2002, Dr. Coco ordered another CT Scan. JE-2B, page HJ-00923. The report indicated that the amount of free fluid seen within the peritoneal cavity had increased since the June 14 CT Scan. JE-2B, page HJ-00923. Dr. C.D. Debose, the radiologist who performed the scan, reported that in light of the "recent cholecystectomy, these findings are suspicious for bile leak . . . from the cystic duct stump . . .". JE-2B, page HJ-00923.

20. Later in the day on June 16, 2002, Mr. Heavener was diagnosed with bile peritonitis and was taken to the operating room for an exploratory laparotomy. JE-2A, page HJ-00626. During the procedure, Dr. Lind removed "multiple liters of bile" from Mr. Heavener's abdomen. JE-2A, page HJ-00626-27, 28.

21. Undisputed testimony revealed that on June 18, 2002, an endoscopic retrograde

cholangiopancreatography (ERCP) was performed during which the source of the bile leak was found to be the cystic duct. The bile leak was treated with sphincterotomy and placement of a stent to aid healing.

22. On June 24, 2002, Mr. Heavener underwent additional surgery because the incision from the June 16 surgery was not healing correctly. JE-2A, page HJ-00629.

23. On July 23, 2002, Mr. Heavener underwent tracheostomy surgery. JE-2A, page HJ-00633. Undisputed testimony revealed that subsequent to this procedure, Mr. Heavener tried to extubate himself and was therefore restrained. The restraints caused permanent nerve damage in Mr. Heavener's right hand.[9]

24. Undisputed testimony revealed that as a result of the various antibiotics that were administered to Mr. Heavener, he suffered renal failure while in the VA Hospital. He therefore had to undergo 15 months of dialysis. Once he was discharged from the VA Hospital, he received his dialysis treatments at Mount Dora Dialysis Center, which is located an hour and fifteen minutes from his home. His treatments lasted three to four hours each, and he received them three days a week. Because his renal function level remains low, there is a strong possibility that Mr. Heavener will have to undergo additional dialysis in the future.

25. On November 27, 2002, Mr. Heavener underwent surgical placement of a dialysis shunt to facilitate his dialysis treatments. JE-10, page HJ-04063-64.

---

[9]Defendant produced evidence to suggest that Mr. Heavener had problems with his hand prior to his June 12, 2002 admission to the VA Hospital. However, this evidence proves only that Mr. Heavener complained of serious problems with his shoulder and elbow, not his right hand. Moreover, Mr. Heavener testified that although he did complain of tremors in his right hand, they resolved prior to the June 12, 2002 admission.

26. On October 2, 2003, Mr. Heavener underwent additional surgery to repair the soccer ball-sized hernia that had developed on his abdomen at the site of the June 16, 2002 surgery. JE-13, page HJ-04124.

27. At trial, Drs. Coletta and Lind testified that had the bile leak been diagnosed and treated before the onset of bile peritonitis on June 16, 2002, the additional surgeries and dialysis would have been avoided.

**B.    FINDINGS OF FACT - DAMAGES**

28. Undisputed evidence revealed that the June 16, 2002; June 24, 2002; July 23, 2002; November 27, 2002; and October 2, 2003 surgeries resulted from the bile peritonitis. Mr. Heavener suffered, and continues to suffer, pain and disfigurement as a result of these procedures.

29. Undisputed evidence revealed that Mr. and Mrs. Heavener have been married for over fifty years and that prior to Mr. Heavener's June 12, 2002 admission to the VA Hospital, they enjoyed a healthy and happy marital life. They were socially active and frequented the VFW and entertained friends.

30. Prior to Mr. Heavener's June 12, 2002 admission to the VA Hospital, he was pleasant and outgoing.[10]

31. Prior to Mr. Heavener's June 12, 2002 admission to the VA Hospital, he enjoyed cooking, dancing, and fishing. In addition, Mr. Heavener took care of the yardwork and

---

[10] Defendant presented evidence to suggest that Mr. Heavener suffered from depression prior to the June 12, 2002 admission to the VA Hospital. However, the evidence indicates that any bout of depression occurred no later than 1998. This Court finds that in the four years leading up to the June 12, 2002 admission, Mr. Heavener's depression had been resolved.

the pool.[11]

32. Undisputed testimony revealed that since his discharge from the VA Hospital on October 5, 2002, Mr. Heavener has been unable to cook, dance, or fish. He has also been unable to take care of the yardwork or the pool.

33. Undisputed testimony revealed that since Mr. Heavener's discharge from the VA Hospital on October 5, 2002, the Heaveners have stopped frequenting the VFW and no longer entertain friends.

34. Undisputed testimony revealed that since his discharge from the VA on October 5, 2002, Mr. Heavener has suffered from depression.

35. Undisputed testimony revealed that since Mr. Heavener's discharge from the VA on October 5, 2002, the Heaveners' martial life has been strained. Mrs. Heavener testified that "Up until his operations, we had a very very successful marriage. Since then it has gone downhill because we don't do anything."

**C.   CONCLUSIONS OF LAW**

36. The Court's jurisdiction arises under the Federal Tort Claims Act (FTCA) as this is a civil claim for medical malpractice against the United States of America. <u>See</u> 28 U.S.C. §§ 1346(b), 2674.

37. The FTCA provides that the United States is liable for tort actions to the same extent as

---

[11]Defendant presented evidence to suggest that Mr. Heavener suffered physical disabilities prior to the June 12, 2002 admission to the VA Hospital and therefore could not have had a high level of activity. However, the evidence indicates that Mr. Heavener's complaints relating to any physical infirmities occurred several years prior to the June 12, 2002 admission. Therefore, this Court finds that these infirmities did not affect Mr. Heavener's activity level immediately preceeding the June 12, 2002 admission.

any individual in similar circumstances.  See § 2674.  Thus, the United States is liable if a private person would be liable under the law of the state where the act or omission occurred.  See id.; § 1346(b); United States v. Muniz, 374 U.S. 150, 153 (1963).

38. The Heaveners have exhausted their administrative remedies and this Court properly has jurisdiction to hear their claims against the federal defendant.[12]

39. Because the alleged malpractice occurred at the VA Medical Center in Gainesville, Florida, the Court must look to Florida law for the substantive law that applies in this case.  See § 1346(b)(1); Horton v. United States, 622 F.2d 80, 82 (5th Cir. 1980).

40. To establish a *prima facie* case of medical malpractice under Florida law, a plaintiff must prove: "(1) A standard of care owed by the defendants to plaintiff[], (2) a breach of that standard, and (3) that said breach proximately caused the damages claimed."  Wales v. Barnes, 278 So.2d 601, 603 (Fla. 1973).

41. With regard to the standard of care, Florida Statute § 766.102 provides that a plaintiff in a medical malpractice case must prove by a greater weight of the evidence that the defendant breached the "prevailing professional standard of care."  The same statute defines prevailing professional standard of care as "that level of care, skill, and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate for reasonably prudent similar heath care providers."  Id.

42. In negligence actions in Florida, courts follow the more likely than not standard of causation and require proof that the negligence *probably* caused the plaintiff's injuries.

---

[12] The parties stipulated that the plaintiffs exhausted all administrative remedies as required before Congress consents to such a suit.  *See* 28 U.S.C.A. § 2675(a).

See Gooding v. University Hosp. Bldg., 445 So.2d 1015, 1018 (Fla.1984).

43. In this case, the Heaveners have proved that by failing to diagnose the bile leak prior to the onset of bile peritonitis, the Defendant's employees breached the prevailing professional standard of care.

44. In addition, the Heaveners have proved that the subsequent injuries and damages claimed by the Heaveners, including Mr. Heavener's pain, suffering, disfigurement, and loss of enjoyment of life, as well as Mrs. Heavener's pain, suffering, and loss of enjoyment of life, were proximately caused by the negligent acts and omissions of the Defendant's employees.

45. The Clerk shall enter judgment against Defendant, United States of America, in the following amounts:

Jackie Colon Heavener

    Non-economic damages:    $750,000.00

    Economic damages:    $34,729.19 to be paid by Defendant directly to medical lien-holders

Betty Heavener

    Non-economic damages:    $250,000.00

46. This Court reserves jurisdiction to award costs as provided by law.

DONE AND ORDERED this 29th day of June, 2005.

                                              *s/ Stephan P. Mickle*
                                              Stephan P. Mickle
                                              United States District Judge